IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

KAREN S. DEARMOND,              :
                                :
     Plaintiff,                 :
                                :
vs.                             :     CIVIL ACTION 11-0244-M
                                :
MICHAEL J. ASTRUE,              :
Commissioner of Social Security,:
                                :
     Defendant.                 :

MEMORANDUM OPINION AND ORDER

In this action under 42 U.S.C. § 405(g), Plaintiff seeks judicial review of an adverse social security ruling which denied a claim for disability insurance benefits (Docs. 1, 16). The parties filed written consent and this action has been referred to the undersigned Magistrate Judge to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73 (*see* Doc. 22). Oral argument was heard on February 27, 2012. Upon consideration of the administrative record, the memoranda of the parties, and oral argument, it is **ORDERED** that the decision of the Commissioner be **REVERSED** and that this action be **REMANDED** for further action not inconsistent with the Orders of this Court.

This Court is not free to reweigh the evidence or

1

substitute its judgment for that of the Secretary of Health and Human Services, *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983), which must be supported by substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The substantial evidence test requires "that the decision under review be supported by evidence sufficient to justify a reasoning mind in accepting it; it is more than a scintilla, but less than a preponderance." *Brady v. Heckler*, 724 F.2d 914, 918 (11th Cir. 1984), *quoting Jones v. Schweiker*, 551 F.Supp. 205 (D. Md. 1982).

At the time of the administrative decision, Plaintiff was fifty years old, had completed high school as well as a business college educational course for legal secretaries (Tr. 36), and had previous work experience as an office assistant to a property tax collector (Doc. 24, Fact Sheet). In claiming benefits, Dearmond alleges disability due to injuries suffered in a motor vehicle accident (Doc. 24, Fact Sheet).

The Plaintiff filed an application for disability insurance benefits on October 11, 2006 (Tr. 92-96; *see also* Tr. 16). Benefits were denied following a hearing by an Administrative Law Judge (ALJ) who determined that although she could not perform her past relevant work, Dearmond was physically capable

of performing specified jobs in the light and sedentary ranges
of work (Tr. 16-29).  Plaintiff requested review of the hearing
decision (Tr. 9-12) by the Appeals Council, but it was denied
(Tr. 1-4).

Plaintiff claims that the opinion of the ALJ is not
supported by substantial evidence.  Specifically, Dearmond
alleges that:  (1) The ALJ did not properly consider the
opinions of her treating physician; (2) the ALJ did not properly
consider her nonexertional impairments of pain and fatigue; and
(3) she does not have the ability to perform the jobs which the
ALJ found she could do (Doc. 16).  Defendant has responded to—
and denies—these claims (Doc. 19).  The relevant medical
evidence of record follows.

Plaintiff was admitted to Thomas Hospital on February 2-5,
2006 for an anterior cervical decompression and fusion of the C3
through C7 to aid in the relief of persistent neck, right
shoulder, and arm symptoms (Tr. 181-87).  It was noted that she
had degenerative disk disease of the cervical spine with
corresponding nerve root impingement and a radiculopathic
component.  Dearmond was stable on discharge with pain
medication.  Over the next several months, outpatient records
from the hospital revealed a normal brainstem auditory-evoked

response, a normal EEG, and a negative MR of the brain; an MRI of the lumbar spine showed central disc protrusions at L4-5 and L5-S1, with bilateral foraminal narrowing at L5-S1 (Tr. 188-91).

Dr. Paul Canale, of Baldwin Bone & Joint saw Dearmond on June 13, 2006 and noted that although she still had some neck pain, it was vastly improving following surgery (Tr. 231; *see generally* Tr. 226-31). He further noted that her neurovascular status was intact distally in both upper extremities; a c-spine series showed anterior cervical plates in good alignment from C3 through C7 with evidence of bone graft and bony growth within the vertebral disc spaces. On August 8, Canale noted that Dearmond could quit wearing her Miami J-style collar but could continue wearing the bone growth stimulator; she was to resume physical therapy and could return to driving and other activities as tolerated (Tr. 230). On August 30, the doctor noted that Plaintiff had suffered a recent fall and had bruising on the arms, shoulders, and back; nevertheless, she had 5/5 strength in her extremities and that sensation was intact (Tr. 227). Radiographs revealed that there had been no damage to the fusion. On October 4, Canale noted that the fusion site was essentially healed and that Dearmond could return to her usual activities; he further noted that she was still having carpal

4

tunnel symptoms on the right and that he would replace the splint that she had lost (Tr. 226).

On September 26, 2006, Dr. Daniel K. Stubler, a Neurologist, examined Plaintiff whose blood pressure was 98/70; motor strength was 5/5 (Tr. 223-24, 287). Deep tendon reflexes were 2/4 throughout; sensory examination revealed some positive Tinel's sign of the right carpal tunnel and cubital tunnel on the right and negative on the left. Gait was normal. Stubler's impression was: (1) most likely encephalopathy related to depression and stress; (2) post-concussive headache syndrome, history of fibromyalgia and vertigo; (3) left lumbar radiculitis as well as cervical radiculitis status post cervical surgery; and (4) probable right carpal tunnel syndrome as well as right cubital tunnel syndrome. The doctor prescribed a low fat and low cholesterol diet.

Notes from Dr. Daren A. Scroggie, a Rheumatologist, on January 13, 2006 show that Plaintiff was about to undergo surgical back fusion to relieve muscle spasm and pain; he talked with her extensively about fibromyalgia and its chronic nature, managed with medication and exercise (Tr. 248; *see generally* Tr. 237-51, 292). He prescribed sleep medication. On the next visit, on March 20, Scroggie noted that she was in no acute

5

distress but that there was limited lateral flexion and rotation in her neck and that extreme range of motion (hereinafter *ROM*) produced pain; he also noted tender paracervical musculature with spasm (Tr. 245). Scroggie noted that Dearmond was recovering well from her fusion surgery and needed less pain medicine; he talked with her again about fibromyalgia. On August 3, the doctor stated that although Plaintiff was in no acute distress, she had pain on palpation at multiple tenderpoints; he further noted that her pain had not responded to conservative measures and that he would try some compounded cream (Tr. 242). Scroggie prescribed Ambien[1] for sleep and Klonipin[2] for anxiety (Tr. 243). On October 25, the doctor noted limited abduction and positive impingement signs in the left shoulder, resulting from a recent fall; he also noted positive Phalen's and Tinel's signs in her wrists (Tr. 239). Dearmond was encouraged to wear wrist braces at night and to avoid precipitating activity; he discontinued her Percocet[3]

---

[1]*Ambien***Error! Main Document Only.** is a class four narcotic used for the short-term treatment of insomnia. *Physician's Desk Reference* 2799 (62nd ed. 2008).

[2]*Klonipin* is a class four narcotic used for the treatment of panic disorder. **Error! Main Document Only.***Physician's Desk Reference* 2732-33 (62nd ed. 2008).

[3]*Percocet* is used for the relief of moderate to moderately severe pain. **Error! Main Document Only.***Physician's Desk Reference* 1125-28 (62nd ed. 2008).

prescription and prescribed Oxycodone[4] (Tr. 240).

On November 6, 2006, Orthopedist Canale noted that
Plaintiff had recently fallen, injuring her neck and shoulder;
he noted improvement and that x-rays showed that her fusion had
not been damaged in the fall (Tr. 295).  A month later, Canale
noted that Dearmond had limited ROM throughout all planes as
well as a positive Hawkins's sign; Plaintiff was very tender to
palpation over the AC joint and had a positive empty can sign
(Tr. 294).  X-rays showed her left shoulder was within normal
limits; he gave her an injection, in the left shoulder, of
Celestone and Marcaine.

On December 5, 2006, Neurologist Stubler reported that
Dearmond was walking on her own and that her motor strength was
5/5; sensory examination was intact (Tr. 302-03; *see generally*
Tr. 297-303).  He noted some positive Tinel's sign of the right
carpal tunnel and cubital tunnel on the right and negative on
the left.  Stubler's impression was 1) most likely
encephalopathy; (2) post-concussive headache syndrome; (3) left
lumbar radiculitis as well as cervical radiculitis; and (4)
probable right carpal tunnel syndrome as well as right cubital

---

[4]**Error! Main Document Only.***Oxycodone* is a pure agonist opioid
whose principal therapeutic action is analgesia. *Physician's Desk
Reference* 2680-81 (62nd ed. 2008).

tunnel syndrome; he prescribed Gabitril[5] and Wellbutrin.[6]
Plaintiff saw the doctor again on April 27, 2007 with complaints
of dizziness and depression for which he discontinued the
Wellbutrin and prescribed Antivert (Tr. 300-01).   Stubler
examined Dearmond on August 23 and noted no real changes.   The
next day, the doctor completed a physical capacities evaluation
in which he indicated that Plaintiff was capable of sitting for
one hour at a time and two hours during an eight-hour day; she
could stand and walk for one hour, each, during an eight-hour
day (Tr. 284).   It was Stubler's opinion that Plaintiff could
lift up to ten pounds occasionally and carry up to five pounds
on an occasional basis; she was not capable of using either hand
or leg controls.   Dearmond would never be able to bend, squat,
crawl, or climb, but could reach occasionally.   The doctor
indicated that she was moderately limited in her ability to work
at unprotected heights and driving automobile equipment and
mildly limited in being around moving machinery.   Stubler also
completed a pain questionnaire in which he found her to suffer
pain to such an extent as to be distracting from performing her
daily activities; he thought that physical activity would

---

[5]*Gabitril* is an anti-epilepsy drug.  **Error! Main Document Only.***Physician's Desk Reference* 2352-53 (62nd ed. 2008).
    [6]**Error! Main Document Only.***Wellbutrin* is used for treatment of

greatly increase her pain (Tr. 285-86).  The doctor thought that
medication would cause to her to suffer some side effects but
that they would not be serious.  On November 21, 2007, the
doctor noted that Dearmond said she was exercising more and was
undergoing hormonal changes; his examination and diagnostic
impression was, essentially, the same as previous visits (Tr.
298).  On February 20, 2008, Dr. Stubler's examination and
impression showed no real changes (Tr. 297).

On December 28, 2006, Rheumatologist Scroggie noted that
Plaintiff was in no acute distress, but that she had limited
lateral flexion and rotation in her neck and that extreme ROM
produced neck pain; she also had tender paracervical musculature
with spasm (Tr. 320-22; *see generally* Tr. 310-22).  The doctor
noted normal ROM in all shoulder planes with multidirectional
instability though there was no tenderness to palpation of the
subacromial bursa; he diagnosed fibromyalgia and depression
which had improved.  Scroggie further noted degenerative changes
in Plaintiff's neck as well as pain and muscle spasm for which
he continued physical therapy stretching exercises and
relaxation techniques; he continued her prescription for
oxycodone.  On April 13, 2007, the doctor did not note the neck

---

depression.  *Physician's Desk Reference* 1120-21 (52nd ed. 1998).

9

limitations of the prior visit; otherwise, the examination and his diagnostic impression were the same (Tr. 317-19).  On June 18, Dr. Scroggie reported pain on palpation of multiple tenderpoints; he otherwise, noted that she was not completely responding to opioid analgesia, so he added Namenda[7] (Tr. 314-16).  On October 30, the doctor found that Dearmond's neck had limited lateral flexion and rotation with extreme ROM producing neck pain; he further noted tender paracervical musculature with spasm and pain on palpation at multiple tenderpoints (Tr. 311-13).  The Rheumatologist's impression was the same as previously noted.

On July 17, 2008, Orthopedic Surgeon Dr. William A. Crotwell, III examined Plaintiff who could flex her knees Indian style: "She brings her knees up to her chest, flexing them 130 to 140 degrees at the knees and bringing the knees up to her chest with no problems, rocking back and forth, moving without any problems" (Tr. 332; *see generally* Tr. 331-34).  Toe and heel walk was fairly normal; forward flexion only 30 to 40 with poor attempt.  "Extension only 10 percent and after just seeing her flex more than 150 degrees, she could only flex 10 percent this

---

[7]*Namenda* is used for the treatment of moderate to severe dementia of the Alzheimer's type. **Error! Main Document Only.***Physician's Desk Reference* 1181-85 (62nd ed. 2008).

time, so this is definitely inconsistent" (*id.*).  Crotwell noted
no tenderness over the paraspinous areas and the L5-S1
generally, but none over the lumbar spine; sensory exam was
spotty over the lower extremities.  Motor was 5/5; straight leg
raise was ninety degrees with no pain sitting while straight leg
raise, while lying down, was ninety degrees with increased pain
on the right and left with plantar flexion.  There was "[n]o
change with dorsiflexion on the right and slightly increased
with dorsiflexion on the left, which is again inconsistent"
(*id.*).  Plaintiff had hyperextension of both elbows about ten
degrees, full flexes, supination, and pronation; Dearmond
complained of tenderness in general over both the medial and
lateral epicondyles.  In the cervical spine, she had forward
flexion of fifty percent, extension of forty percent, and
lateral motion of fifty percent; "[s]ensory was totally
decreased in the right arm over no dermatome with some very
strange, spotty changes" (*id.*).  Grip strength was normal.
Crotwell's impression was that she had post-operative cervical
fusion C3 through C7 with no radiculopathy at the present time;
he further noted a history of elbow pain, a history of carpal
tunnel syndrome, a history of lumbar pain, and a history of knee
pain, though he found no objective evidence of any of these.

11

This is the conclusion of the evidence reviewed by the ALJ. It should be noted that "[a] reviewing court is limited to [the certified] record [of all of the evidence formally considered by the Secretary] in examining the evidence." *Cherry v. Heckler*, 760 F.2d 1186, 1193 (11th Cir. 1985).  However, "new evidence first submitted to the Appeals Council is part of the administrative record that goes to the district court for review when the Appeals Council accepts the case for review as well as when the Council denies review." *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1067 (11th Cir. 1994). However, "when the [Appeals Council] has denied review, we will look only to the evidence actually presented to the ALJ in determining whether the ALJ's decision is supported by substantial evidence." *Falge v. Apfel*, 150 F.3d 1320, 1323 (11th Cir. 1998), *cert. denied*, 525 U.S. 1124 (1999).

In examining the action at hand, the Court notes that the Appeals Council denied review of the additional evidence (Tr. 1-4).  The Court further notes that Plaintiff is claiming that the ALJ's decision is not supported by substantial evidence and is not challenging the Appeals Council's decision to deny review of the new evidence (Docs. 1, 16).  Therefore, this Court need not review the new evidence. *Falge*, 150 F.3d at 1324.  The Court

12

will limit its review of the evidence to the same evidence that the ALJ considered.

Dearmond claims that she does not have the ability to perform the jobs which the ALJ found she could do (Doc. 16, pp. 18-20).  The Court notes that, based on questions asked of the vocational expert (hereinafter *VE*), the ALJ determined that Dearmond had the ability to perform the jobs of surveillance, system monitor, parking lot attendant, and gate guard (Tr. 28-29).

The ALJ's specific questions to the VE were as follows:

> Q  If I were to assume a hypothetical individual who has similar age, education and past work history as Ms. Dearmond and we're to assume that this individual retains the residual functional capacity to perform light work, they could return to both of those positions?
>
> A  Yes, ma'am.
>
> Q  And if I were to find sedentary work that she could – they could not return to those positions?
>
> A  Yes, ma'am, that's correct.
>
> Q  And if I were to also assume that they could – further assume that they – that such a person could perform light work activity as that's defined in the Dictionary of Occupational Titles, but they would need an option to sit or stand to relieve pain, would there be positions that the person

> could perform?  And that they would also
> need simple, one to two-step tasks.
>
> A  There would be some positions that
> would be available that would be sit/stand
> option type jobs that would be in the light
> category.  Some examples of those would be
> parking lot attendant, which would be <u>DOT</u>
> code 915.473-010.  And –
>
> Q  Numbers?
>
> A  There's 48,000 in the nation and
> about 850 in the state.
>
> Q  There would be a surveillance system
> monitor, which is <u>DOT</u> code 379.367-010.
> There's about 50,000 in the nation, 1,000 in
> the state of Alabama.
>
> Q  Okay.
>
> A  There would be gate guard, which is
> <u>DOT</u> code – 372.667-030.  And there's 100,000
> in the nation, 2,000 in the state.

(Tr. 52-53).  The Court notes that, according to the *DOT*, the

surveillance system monitor is a sedentary position while

parking lot attendant and gate guard are both light jobs.  *See*

http://www.occupationalinfo.org/.

The Court notes that the ALJ determined that Dearmond had

the ability to perform a limited range of light work.  Even more

specifically, the ALJ found that

> the claimant's capacity for a "full range"
> of light work in inhibited by the need to

14

> avoid lifting and carrying of greater than
> 15 pounds, sit and stand at her option every
> 1 to 2 hours to help alleviate some credible
> mild symptoms, and remember, understand, and
> carry out more than simple work one and two
> step work tasks.

(Tr. 26-27).

The Court finds that the ALJ's finding of Plaintiff's residual functional capacity (hereinafter *RFC*) is inconsistent with the hypothetical questions posed of the VE.  Specifically, although the ALJ's hypothetical included the option to stand or sit and the need for one-to-two step instructions, the ALJ specified light work as it's defined in the *DOT* (Tr. 53).  Light work, under the social security regulations, specifically allows for lifting up to twenty pounds.  20 C.F.R. § 404.1567(b) (2011).

The ALJ's RFC is inconsistent with the questions posed to the VE.  The Eleventh Circuit Court of Appeals has held that an ALJ's failure to include severe impairments suffered by a claimant in a hypothetical question to a VE to be reversible error where the ALJ relied on that expert's testimony in reaching a disability decision.  *Pendley v. Heckler*, 767 F.2d 1561 (11th Cir. 1985).  Although the ALJ's error in this action was not the failure to include severe impairments, the failure

to properly present Dearmond's RFC to the VE is no less serious.

With this finding, the Court cannot say that the VE's—and, therefore, the ALJ's—conclusion that Plaintiff is capable of performing the jobs of parking lot attendant and gate guard is supported by substantial evidence as they are both light work jobs.  As far as the other job, the Court notes that the *DOT* sets out the requirements for surveillance system monitor as follows:

> Monitors premises of public transportation
> terminals to detect crimes or disturbances,
> using closed circuit television monitors,
> and notifies authorities by telephone of
> need for corrective action:  Observes
> television screens that transmit in sequence
> views of transportation facility sites.
> Pushes hold button to maintain surveillance
> of location where incident is developing,
> and telephones police or other designated
> agency to notify authorities of location of
> disruptive activity.  Adjusts monitor
> controls when required to improve reception,
> and notifies repair service of equipment
> malfunctions.
> GOE: 04.02.03 STRENGTH: S GED: R3 M1 L3 SVP:
> 2 DLU: 86

*see* http://www.occupationalinfo.org/37/379367010.html.  This is relevant because Plaintiff has directed the Court's attention to another inconsistency in the ALJ's opinion.  Specifically, in reporting the findings by Dr. Crotwell, the ALJ stated as

follows: "[t]he claimant was considered able to only occasionally (not frequently or repetitively) utilize her hands to grasp or push and pull, i.e. with excessive twisting and turning or repetitive overhead activities ruled out completely" (Tr. 26). Dr. Crotwell actually found that Dearmond could never use her hands for pushing and pulling of arm controls or simple grasping (Tr. 334). This casts doubt on her ability to perform the job of surveillance systems monitor as the *DOT* states that it requires the ability to "[p]ush[] hold button to maintain surveillance of location where incident is developing." While this is a small thing—and might actually be an insignificant difference—the Court is not in a position to make that finding.[8] It does find, however, that the ALJ's conclusions cannot be found to be supported by substantial evidence.

Therefore, it is **ORDERED** that the action be **REVERSED** and **REMANDED** to the Social Security Administration for further administrative proceedings consistent with this opinion, to include, at a minimum, a supplemental hearing for the gathering of evidence regarding what work Plaintiff can perform. Judgment will be entered by separate Order. For further procedures not

---

[8]The Court notes that Plaintiff has also asserted that as she was fifty years old at the time of the ALJ's decision, a finding that she was capable of performing only unskilled sedentary work would mean

17

inconsistent with this recommendation, see *Shalala v. Schaefer*,
509 U.S. 292 (1993).

DONE this 29th day of February, 2012.


                              s/BERT W. MILLING, JR.
                              UNITED STATES MAGISTRATE JUDGE

---

that she was disabled under the GRID (*see* Doc. 16, p. 20).  The Court
will not, however, reach that question in this decision.